**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-23524-BLOOM/Torres**

ARCH INSURANCE COMPANY,

      Plaintiff,

v.

A3 DEVELOPMENT, LLC, a foreign
Limited liability company; A3 NORTH
DEVELOPMENT, LLC, a foreign limited
A liability company; and A3 AMENITIES,
LLC, a foreign limited liability company,

      Defendants.

_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendants A3 Development, LLC ("A3 Development"), A3 North Development, LLC ("A3 North"), and A3 Amenities, LLC's ("A3 Amenities") (collectively "Defendants") Motion for Summary Judgment, ECF No. [123]. Plaintiff Arch Insurance Company filed a Response in Opposition ("Plaintiff's Response"), ECF No. [140], to which Defendants filed a Reply, ECF No. [150]. Also before the Court is Plaintiff's Motion for Partial Summary Judgment as to Liability. ECF No. [129]. Defendants filed a Response in Opposition ("Defendants' Response"), ECF No. [142], to which Plaintiff filed a Reply. ECF No. [151]. The Court has carefully reviewed the parties' Motions, the submissions in support and in opposition, the record, and is otherwise fully advised. For the reasons that follow, Defendants' Motion is denied, and Plaintiff's Motion is granted.

## I.   BACKGROUND

### A.  Material Facts

Based on the parties' briefings, the statements of material facts, and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted by the Court.[1]

### a.   The Bonds (Coastal Bonds and A3 Bonds)

Defendants are developers who set out to construct "a multi-tower condominium development located at 17901 Collins Avenue and 17975 Collins Avenue in Sunny Isles Beach, Florida 33160, known as The Estates at Acqualina (the 'Project')." ECF No. [124] at ¶ 1. Defendants "originally retained Coastal Construction Group ('Coastal') to serve as the general contractor for the Project." *Id.* at ¶ 3. Coastal hired various subcontractors for the Project, "including R&S Concrete South, Inc. ('R&S Concrete')." After being hired, R&S Concrete "entered into various written subcontracts with Coastal for concrete/shell and masonry work [for] the Project (the 'Subcontracts')," and commenced work on the Project in October of 2018. *Id.* at ¶¶ 4-5.

Plaintiff is in the business of providing surety bonds. In connection with the Subcontracts, Plaintiff issued the following "four (4) performance bonds on behalf of R&S Concrete, as principal, and in favor of Coastal, as obligee, and [Defendants] as additional obligees: (i) Bond

---

[1] Before setting out the facts in this case, the Court notes that Defendants failed to file a proper response to Plaintiff's Statement of Material Undisputed Facts in accordance with the Local Rules. *See* S.D. Fla. L.R. Rule 56.1(b)(2). Rather than filing a response that "correspond[ed] with the order and paragraph numbering format used by the movant," starting every paragraph-by-paragraph response [with] the word 'disputed' or 'undisputed[,]'" and providing specific evidentiary citations in support of the disputed facts, Defendants simply refiled the Statement of Material Facts they relied upon in support of their own Motion for Summary Judgment. *Compare* ECF No. [124] with ECF No. [143]. Accordingly, the Court treats the statements in Plaintiff's Statement of Material Undisputed Facts, ECF No. [130], as admitted for the purposes of this Opinion, so long as they are supported by properly cited evidence and not contradicted by Defendants' properly filed Statement of Material Facts. *See* S.D. Fla. L.R. (56)(1)(c); *see also BMU, Inc. v. Cumulus Media, Inc.*, 366 F. App'x 47, 49 (11th Cir. 2010) (finding no error with district court's decision to deem all of the facts in the plaintiff's statement of material facts as admitted where the party's response to the opposing party's statement of material facts did not comply with the local rules).

No. SU1153414 ('STS Coastal Bond'); (ii) Bond No. SU1153418 ('STM Coastal Bond'); (iii)

Bond No. SU1153423 ('NTS Coastal Bond'); and (iv) Bond No. SU1166279 ('NTM Coastal

Bond') (collectively, the 'Original Bonds' or the 'Coastal Bonds')." *Id.* at ¶ 6.

The Coastal Bonds contained the following conditions precedent in the event of a claimed

default:

> Whenever Subcontractor shall be and is declared by [Defendants][2] to be in default under the Subcontract Agreement, [Defendants], having substantially performed [Defendants'] obligations thereunder, Surety shall promptly remedy the default and shall promptly . . .
>
> > A. Complete the Subcontract Agreement in accordance with its terms, conditions, and time limitations, or
> >
> > B. Obtain a bid or bids for completing the Subcontract Agreement in accordance with its terms, conditions, and time limitations, and upon determination by Surety of the lowest responsible bidder, or, if [Defendants] elect[ ], upon determination by [Defendants] and Surety jointly of the lowest responsible bidder, arrange for a subcontract agreement between such bidder and Surety or [Defendants], at [Defendants] sole option, and make available as work progresses . . . sufficient funds to pay the cost of completion less the balance of the subcontract price, but not exceeding, including other costs and damages for which Surety may be liable hereunder . . ..

ECF No. [130] at ¶ 3 (quoting ECF No. [80-1] at 1).

The rider adding additional obligees further provided that:

> [T]here shall be no liability of the Surety under the attached bond . . . unless and until the Bond Obligees shall make payment to the Principal or to the Surety (should the Surety arrange for or undertake the completion of the Contract upon the default of the Principal) . . . and otherwise satisfy all terms and conditions and perform all of the other obligations to be performed under the Contract . . . all of the acts of one Obligee being binding upon the other.

*Id.* at ¶ 4 (quoting ECF No. [80-1] at 7).

---

[2] Although the Coastal Bonds refer to Coastal as the obligee, the parties executed "Riders" to the Coastal Bonds, adding Defendants as additional obligees. *See* ECF No. [80-1]. For clarity, the Court has replaced Coastal with Defendants wherever the Coastal Bonds refer to Coastal as the obligee.

After the Coastal Bonds were issued, Defendants had Suffolk Construction Company, Inc. ("Suffolk") replace Coastal as the general contractor for the Project. ECF No. [124] at 7. Because a new general contractor was assigned to the Project, Plaintiff, Defendants, and R&S Concrete entered into a Continuation Agreement on September 14, 2020, which required that R&S Concrete "continue to perform its work on the Project under the same terms as the Subcontracts with Coastal." *Id.* at ¶ 9. The Continuation Agreement further provided that the Coastal Bonds were released "except for latent defects in R&S's prior work." ECF No. [130] at ¶ 7.[3] Since the Coastal Bonds were in large part released, Plaintiff agreed it would issue new performance bonds for the work R&S Concrete performed after Coastal had ceased working on the Project. ECF No. [124] at ¶ 9.

Shortly after entering into the Continuation Agreement, Plaintiff issued the following four new performance bonds on behalf of R&S Concrete, as principal, and Defendants, as obligees: "(i) Bond No. SU1166299 ("STS A3 Bond"); (ii) Bond No. SU1166300 ("STM A3 Bond"); (iii) Bond No. SU1166301 ("NTS A3 Bond"); and (iv) Bond No. SU1166302 ("NTM A3 Bond") (collectively, the "A3 Bonds," together with the Coastal Bonds, the "Bonds"). *Id.* at ¶ 11.

The A3 Bonds provided that so long as R&S performed under the Subcontracts, neither Plaintiff nor R&S Concrete had any obligations under the Bonds "except when applicable to participate in a conference as provided in [§] 3." *Id.* at ¶ 14. (quoting ECF No. [80-4] at 3, 13, 23, 33, § 2). If, on the other hand, R&S defaulted on the Subcontracts and Defendants sought to make

---

[3] The Continuation Agreement also reduced the penal sums in the Coastal Bonds and required Defendants to accept that there were no "material defects in R&S [w]ork" as of the date of Coastal's cessation. *See* ECF No. [130] at ¶ 7. The penal sums for the A3 Bonds would be as follows: (1) South Tower Shell: $2,371,249.04; (2) South Tower Masonry: $886,086.38; (3) North Tower Shell: $8,930,099.70; and (4) North Tower Masonry: $1,022,477.24. *Id.*

a demand on Plaintiff based on the default, Defendants were required to satisfy the following conditions precedent before Plaintiff's surety obligations were triggered:

1. [T]he Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

2. [T]he Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

3. [T]he Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

ECF No. [124] at ¶ 15 (quoting ECF No. [80-4] at 3, 13, 23, 33 § 3). § 4, however, clarifies that "[f]ailure on the part of the Owner to comply with the notice requirement in [§] 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice." *Id.* at ¶ 16 (quoting ECF No. [80-4] at 3, 13, 23, 33, § 4).

Upon Defendants' satisfaction of the conditions set forth in § 3, the Bonds provided that Plaintiff was required to elect one of the following § 5 remedies:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction

Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances: (.1) After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or (.2) Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

*Id.* at ¶ 17 (quoting ECF No. 80-4 at 3, 13, 23, 33 § 5). If Plaintiff failed to properly elect a remedy with "reasonable promptness," Plaintiff would be "deemed to be in default on th[e] Bond[s] seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under th[e] Bond[s]." *Id.* at ¶ 18 (quoting ECF No. [80-4] at 3, 13, 23, 33 § 6).

### b.  Issues With R&S Concrete's Work

Notwithstanding the terms of the Bonds, the Subcontracts, and the Continuation Agreement, on October 15, 2020, Defendants and Suffolk amended Suffolk's contracts[4] to provide that "Suffolk would be 'solely responsible' for the 'timely' and 'proper' completion of R&S's work." ECF No. [130] at ¶ 13. Accordingly, "Suffolk would handle all defects and delays by R&S 'as if R&S w[ere] under direct privity with Suffolk." *Id.* At no point prior to executing Change Order No. 001 did Defendants notify Plaintiff or R&S that Suffolk would be responsible for supplementing or curing any future defects in R&S's work. Nevertheless, Suffolk "proceeded to correct any alleged defective work of R&S under the Subcontracts, and [Defendants] began to

---

[4] The amendment is titled "Change Order No. 001." *See* ECF No. [130] at ¶ 13.

back charge R&S for the cost of that work, without giving notice to [Plaintiff] or giving [Plaintiff] an opportunity to correct the same[.]" *Id.* at ¶ 14.

On September 23, 2021, Defendants issued "a Notice of Intent to Declare Default, Opportunity to Cure and Demand for Pre-Default Meeting" to R&S Concrete and Plaintiff because of R&S Concrete's alleged threat to cease work on the Project due to non-payment under the Subcontracts. ECF No. [124] at ¶ 19. Defendants also attached a document to the pre-default notice "entitled 'R&S Backcharge Summary,' indicating a total of $5,541,795.71 in supplementation work, alleged corrective work, and other backcharges already incurred against R&S." ECF No. [130] at ¶ 16. Plaintiff responded to the Notice on September 29, 2021, stating that "it would conduct an independent investigation into whether R&S Concrete had breached the Subcontracts, and to determine what steps [Plaintiff] might be required to take to remedy the alleged defaults." ECF No. [124] at ¶ 20. On October 12, 2021, the parties conducted a pre-default meeting, and "R&S [ultimately] continued to perform work on the Project." *Id.* at ¶ 21.

On May 17, 2022, without notice to Plaintiff or R&S, Defendants entered into a "Settlement Agreement" with Suffolk, wherein the Defendants and Suffolk unilaterally agreed that Defendants would "keep $907,000 of R&S['s] Subcontract balances to pay for supplementation, and [Defendants] would unilaterally take approximately $3.3 million of R&S's Subcontract balances and pay [the] same to Suffolk for performing corrective work" on the Project. ECF No. [130] at ¶ 19. Defendants and Suffolk "also agreed to keep performing corrective work in the future and keep deducting the cost from R&S's Subcontract balance." *Id.*

On July 5, 2023, Defendants sent a second § 3.1 notice to Plaintiff and R&S "advising of [Defendants'] intent to declare R&S Concrete in default." ECF No. [124] at ¶ 24. In the Notice, Defendants also requested another pre-default meeting, and for the first time, "identified alleged

construction defects with R&S' work under the Subcontracts as a basis for their intent to declare default." ECF No. [124] at ¶ 24; ECF No. [130] at ¶ 20.

On July 10, 2023, Defendants issued a Notice of Construction Defect Claim regarding purported deficiencies in the Project's concrete foundation, and on July 21, 2023, Defendants held another pre-default meeting with Plaintiff and R&S to "identif[y] several defaults by R&S [ ] which formed the basis of the Second Notice of Intent." ECF No. [124] at ¶¶ 25-26. Over the next several months, Defendants identified further defects and, eventually, the parties conducted an on-site visual inspection of the alleged defects and deficiencies. *See id.* at ¶¶ 27-28. Despite meeting and conferring over R&S's alleged defaults, the parties were unable to resolve the dispute during the inspection. *See id.* at ¶ 29.[5] Consequently, on September 8, 2023, Defendants "issued [their] Owner's Formal Notice of Default and Termination of R&S Concrete." *Id.* at ¶ 30. In the Formal Notice, Defendants not only terminated R&S, but they also made a demand on the Bonds and requested that Plaintiff issue its election of remedies in the next seven (7) days.[6] *See id.* at ¶¶ 30-32.

The Formal Notice stated that "Defendants had incurred significant costs in remedying R&S Concrete's defective and nonconforming work and would likely continue to incur additional costs in remedying R&S Concrete's defective work." *Id.* at ¶ 34. Moreover, Defendants "agree[d]

---

[5] While Plaintiff contends that R&S was not default on the Subcontracts prior to Defendants' declaration of default and therefore challenges Defendants' assertion that "[t]he parties were unable to resolve their dispute," *see* ECF No. [124] at ¶ 29; ECF No. [141] at ¶ 29, the September 8, 2023 Formal Notice of Default eliminates any suggestion that the parties reached an agreement that R&S had adequately performed on its obligations under the Subcontracts. By virtue of filing the Formal Notice of Default, Defendants made clear they believed that R&S had defaulted. Accordingly, the Court does not find there to be a genuine dispute as to whether the parties resolved the issues concerning R&S's completion of the Subcontracts during the August 22, 2023 inspection. Nor does the Court find the challenged assertion to be a material fact that is necessary to resolve the parties' Motions.

[6] Defendants also noted in their Formal Notice of Default that "more than 30 days had passed since [Plaintiff's] request for additional time to investigate" and "[a]t most, Article 26 of the Subcontracts required providing R&S Concrete a 48-hour cure period." ECF No. [124] at ¶ 31.

to pay Surety[,] or a contractor selected to complete the work, the balance of the subcontract price in accordance with the terms" of the Continuation Agreement, the Subcontracts, the A3 Bonds and the Coastal Bonds, "but only to the extent such amounts [were] properly pursuant to the parties' contracts." *Id.* ¶ 33. On September 12, 2023, Plaintiff responded to the Formal Notice by:

> (a) objecting to the improper seven (7) day notice under the A3 Bonds; (b) confirming that the [Defendants] had disclosed their processing of $9,913,701 in Suffolk backcharges to supplement and correct R&S' work and that [Defendants] had an additional $2,252,703 in backcharges to complete R&S work, resulting in a total depletion of contract funds in excess of $12 million; and (c) acknowledging that [Defendnats] had represented to [Plaintiff] there were no remaining Subcontract funds available to tender to [Plaintiff] in accordance with [§] 3.3 of the A3 Bonds.

ECF No. [130] at ¶ 24. Plaintiff also sought clarification from Defendants "as to the specific amount of the 'Balance on the Contract Price' that [Defendants] would be tendering to [Plaintiff] under [§] 3.3. of the A3 Bonds." *Id.* However, Defendants "never responded or tendered any Subcontract funds to [Plaintiff]." *Id.* at ¶ 25.

### c.   Procedural Posture

On September 14, 2023, Plaintiff commenced the instant action, and, on November 3, 2023, Defendants issued a Notice of Withdrawal and Cancellation of Notices of Default and Claims on Bonds to Arch and R&S Concrete. *Id.* at ¶ 41. Since the inception of this suit, the parties have gone through several rounds of pleadings, and as such, the Third Amended Complaint ("Complaint') is the operative pleading. ECF No. [80]. While the Complaint originally asserted eight Declaratory Judgment claims and eight Breach of Contract claims, the Court has since dismissed the Declaratory Judgment claims, leaving only the eight Breach of Contract claims to be considered on summary judgment. ECF No. [98]. Each one of Plaintiff's Breach of Contract claims concerns a distinct bond.  Count I, III, V, and VII concern the four original Coastal Bonds,

and Counts IX, XI, XIII, and XV concern the A3 Bonds issued after the parties entered into the Continuation Agreement.

Defendants now seek summary judgment because they did not materially breach any of the Bonds. Defendants maintain that they complied with all the procedural requirements for declaring a default, terminating a subcontractor, and making a demand on Plaintiff, and their decision to hire Suffolk to provide supplemental work did not violate any provision of the Bonds. As such, Defendants insist they are entitled to judgment as a matter of law on all of Plaintiff's Breach of Contract claims.

Plaintiff opposes Defendants' request for summary judgment and argues that the Court should instead award judgment in its favor on all claims. Plaintiff contends that Defendants materially breached the Bonds by: (1) delaying the declaration of default and unilaterally hiring Suffolk to complete R&S's purportedly defective work without first providing Plaintiff notice or an opportunity to exercise its completion options; (2) failing to tender the remaining balances on the Subcontracts following Defendants' declaration of default; (3) improperly sending Plaintiff a § 6 supplemental notice to perform with the original declaration of default rather than waiting a reasonable amount of time for Plaintiff to exercise one of its completion options; and (4) making a demand on the Bonds notwithstanding that Defendants had breached the Subcontracts and R&S was not in default. The parties' Motions are now fully briefed and are ripe for review.

## II.   LEGAL STANDARD

### A.  Rule 56(a)—Summary Judgment Standard

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must

produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination [of] whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331).

In particular, where "the parties respond[ ] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[ ] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Ga. State Conf. of NAACP*, 775 F.3d at 1345-46; *see Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of

12

demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook*, 713 F.2d at 665 (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

## III.  DISCUSSION

"The purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 198 (Fla. 1992). "A bond is a contract, and, therefore, a bond is subject to the general law of contracts." *Id.* Under Florida law,[7] an ambiguous contract creates an issue of fact that precludes the grant of summary judgment. *See John M. Floyd & Assocs., Inc. v. First Fla. Credit Union*, 443 Fed. App'x. 396, 398 (11th Cir. 2011) (citing *Talbott v. First Bank Fla.*, 59 So. 3d 243, 244 (Fla. 4th DCA 2011)). However, the interpretation of an unambiguous contract "is a question of law which can be resolved on summary judgment." *Id.* (quoting *PNC Bank, N.A. v. Progressive Emp'r Servs. II*, 55 So. 3d 655, 658 (Fla. 4th DCA 2011)); *Ben-Yishay v. Mastercraft Dev., LLC*, 553 F. Supp. 2d 1360, 1373 (S.D. Fla. 2008) ("Interpretation of a clear and unambiguous contractual provision is a question of law properly decided on summary judgment.").

Furthermore, "[w]hether a contract is or is not ambiguous is a question of law to be determined by the trial court." *Ocean Reef Club, Inc. v. UOP, Inc.*, 554 F. Supp. 123, 128 (S.D. Fla. 1982); *see also Centennial Mortgage, Inc. v. SG/SC, Ltd.*, 772 So. 2d 564, 565-66 (Fla. 1st DCA 2000). If it is determined that no ambiguity exists, then the contract is interpreted according to its plain meaning. *Handi-Van, Inc. v. Broward Cnty., Fla.*, No. 08-62080-CIV, 2010 WL

---

[7] "[I]nterpretation of a contract is governed by the law of the jurisdiction where the contract was executed." *Econ. Premier Assurance Co. v. Elie*, No. 07-60995-CIV, 2007 WL 9701042, at *5 (S.D. Fla. Nov. 21, 2007). Accordingly, because there is no dispute that the Bonds were entered into in Florida, Florida's laws of contract interpretation apply.

Case No. 23-cv-23524-BLOOM/Torres

1223776, at *2 (S.D. Fla. Mar. 29, 2010) *aff'd*, 445 Fed. App'x. 165 (11th Cir. 2011) (citing *Anthony v. Anthony*, 949 So. 2d 226, 227 (Fla. 3d DCA 2007)).

Here, neither party contends that the Bonds are ambiguous. *See* ECF No. [123] at 6; ECF No. [129] at 3-4. "When the unambiguous language of a contract sets forth the manner in which a party must exercise a remedy in the event of a default, the party is bound by and must strictly adhere to the language." *Sch. Bd. of Escambia County, Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1353 (N.D. Fla. 2000). However, mere non-compliance with any bond provision is not necessarily enough to prove a breach of contract claim. *See Eclectic Synergy, LLC v. Seredin*, 347 So. 3d 27, 29 (Fla. 4th DCA 2022) (noting that "trivial noncompliance and minor failings" will not support a breach of contract claim). The breach in question must be "material." *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 734 (S.D. Fla. 2007) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003)). To satisfy the materiality requirement, the defendant's failure to perform must violate a contractual obligation that "goes to the essence of the contract" and "it must be the type of breach that would discharge the injured party from further contractual duty." *J.J. Gumberg Co.*, 847 So. 2d at 1049 (quoting *Atlanta Jet v. Liberty Aircraft Servs., LLC,* 866 So. 2d 148, 150 (Fla. 4th DCA 2004)). With these principles in mind, the Court turns to the parties' arguments.[8]

### A. Parties' Arguments in Support of Summary Judgment

Defendants' Motion argues they are entitled to summary judgment because their decision to unilaterally hire Suffolk to supplement R&S Concrete's defective work without notifying

---

[8] Before addressing the parties' respective arguments, the Court points out that the parties agree that the Bonds are valid contracts. Accordingly, the only issues for the Court to resolve at this juncture are whether the undisputed material facts establish, as a matter of law, that Defendants materially breach the Bonds, and whether the material breach ultimately resulted in damages to Plaintiff. *See Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017) ("To prevail in a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages.").

Plaintiff does not constitute a material breach of the Bonds, given that the plain language of the Bonds does not require Defendants to provide Plaintiff notice before taking such unilateral action. *See* ECF No. [123] at 4. According to Defendants, they properly complied with the three exclusive conditions precedent for making a demand on Plaintiff under the Bonds. *Id.* As for the first requirement that Defendants "provide[] notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default," Defendants contend they sent Plaintiff multiple notices that they were considering default. Specifically, Defendants claim they sent the first Notice of Intent on September 23, 2021, then another on July 5, 2023, and finally a third Notice on July 26, 2023. *See id.* at 11.

Defendants further maintain that it is undisputed they satisfied the second condition precedent by declaring R&S in default and providing Plaintiff over thirty days in which to "offer to cure R&S Concrete's defaults and issue an election of remedies," despite the Subcontracts only requiring them to give Plaintiff forty-eight (48) hours to respond.  *Id.*

Finally, because neither R&S Concrete nor Plaintiff took any action to cure the identified defects, Defendants "issued the written Notice of Default, which declared R&S Concrete in default, terminated the Subcontracts, and provided notice to [Plaintiff] of such, as expressly required by [§] 3(2) of the Bonds." *Id.* at 12. Therefore, because Defendants satisfied all the notice requirements and other conditions precedent under the Bonds, Defendants maintain that Plaintiff has no basis to argue that it was prejudiced or otherwise deprived of exercising its contractual rights. According to Defendants, if Plaintiff wanted them to provide notice before supplementing R&S Concrete's insufficient labor or defective work, Plaintiff "should have added explicit language to that effect in the Continuation Agreement, the Bonds, or both." *Id.* at 4.

Plaintiff responds both in its Motion and Response in Opposition[9] that, notwithstanding that the Bonds do not explicitly require Defendants to provide Plaintiff with notice before unilaterally attempting to cure defects in R&S's work on the Project, Defendants still materially breached the terms of the Bonds by manipulating the timing of their declaration of default and depriving Plaintiff from exercising its bargained-for completion rights under the Bonds. *See* ECF No. [140] at 2. Plaintiff points out that under the Coastal Bonds, its surety obligations are only triggered where R&S has defaulted on the Subcontract and the default is declared to Plaintiff. ECF No. [129] at 4. Plaintiff contends the A3 Bonds impose the same conditions precedent but also require that Defendants terminate the Subcontracts when they declare a default. *See id.* Therefore, under the Bonds, once R&S defaults, Plaintiff may not intervene and exercise its rights to elect one of its bargained-for remedies until Defendants properly declare R&S to be in default. *See* ECF No. [140] at 4. Consequently, because Defendants identified allegedly defective work they believed might constitute a default in 2021, but did not declare a default or terminate the R&S Subcontracts until 2023—well after Defendants had already hired Suffolk and used at least $5 million in Subcontract funds to cure the defective work—Plaintiff contends it was effectively stripped of its bargained-for right to complete the Subcontracts or otherwise perform as it sought fit. *See* ECF No. [140] at 10; ECF No. [129] at 13. Plaintiff maintains that "Florida law recognizes the surety's rights to proper notice and time to address a default as material rights, the deprivation of which breaches the bond[.]" ECF No. [140] at 4 (emphasis removed). Consequently, although Defendants may have technically provided the required notices eventually, Plaintiff argues Defendants still materially breached the Bonds by not providing prompt notice of R&S's default

---

[9] Because Plaintiff makes virtually the same argument in opposition to Defendants' Motion for Summary Judgment as it does in support of its own Motion for Partial Summary Judgment, the Court addresses both briefs simultaneously. *Compare* ECF No. [129] *with* ECF No. [140].

in 2021, and by not providing Plaintiff with a reasonable opportunity to complete the Subcontracts before hiring Suffolk to supplement the work.

Plaintiff argues that Defendants also materially breached the Bonds by failing to provide "additional written notice" as required under § 6 of the Bonds. *See* ECF No. [129] at 16. According to Plaintiff, Defendants' notice of default and termination of the Subcontracts included the § 6 demand that Plaintiff elect an option to cure R&S default within seven days. *Id.* Plaintiff insists, however, that the additional notice and demand under § 6 was to be issued separately after Defendants had given Plaintiff a reasonable amount of time to elect a curative option under § 5 of the Bonds. *See id.* Plaintiff contends that a failure to wait for a reasonable period before issuing the § 6 notice constitutes a material breach of the Bonds. *Id.* at 18.

Moreover, even assuming that all the notices and the declaration of default were proper, Plaintiff argues that Defendants' "unilateral and unjustified depletion of the available [Subcontract] balances" prior to declaring a default independently amounts to a material breach of the Bonds. *Id.* at 13. According to Plaintiff, as a general principle of surety law, and under § 3.3 specifically, the surety has a priority right to any unpaid balance of the subcontract funds following a declaration of default. *See id.* at 15. Therefore, by dissipating the remaining balance of the Subcontract funds to pay Suffolk to perform supplemental or remedial work, Defendants materially breached § 3.3 of the Bonds. *Id.*

Finally, Plaintiff argues that the undisputed evidence establishes that R&S never defaulted on the Subcontracts, and that prior to making a demand on the Bonds, Defendants had already materially breached the underlying Subcontracts by backcharging funds and failing to remit $3 million they owed to R&S. *See id.* at 18. Plaintiff further argues that the Bonds condition any valid

demand upon two prerequisites: (1) that R&S be in default,[10] and (2) that Defendants themselves not be in default under the Subcontracts. *See id.* at 19-20. Because neither condition was satisfied when Defendants made their demand, Plaintiff contends that Defendants' demand on the Bonds amounted to a material breach, rending them null and void. *See id.*

### A. Improper Notice and Inadequate Opportunity to Complete Subcontracts

The Court first addresses whether Defendants' unilateral decision to hire Suffolk and use the remaining Subcontract funds prior to declaring a default constitutes a material breach of the Bonds. "Generally, an 'obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach[.]'" *PCL Constr. Servs., Inc. v. Hanover Ins. Co.*, No. 611CV131ORL18DAB, 2012 WL 13102409, at *6 (M.D. Fla. Aug. 28, 2012) (quoting *Sch. Bd. of Escambia Cnty., Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000) and citing *Dooley & Mack Constructors, Inc. v. Developers Sur. and Indem. Co.*, 972 So. 2d 893, 894 (Fla. 3d DCA 2008) (where the bond requires notice of default, a general contractor's completion of the subcontract without giving surety the opportunity to exercise its completion options breaches the bond and discharges surety's liability as a matter of law)).

Florida courts have consistently found that an obligee's unilateral decision to hire an alternate contractor to complete a subcontract without first giving the surety proper notice of a default and an opportunity to exercise its completion options deprives a surety of its ability to protect itself and, therefore, such conduct constitutes a material breach of the bond. *See e.g., Sch.*

---

[10] Although it appears that only the Coastal Bonds expressly require the subcontractor to be in default before Defendants may terminate the Subcontracts and make a demand on the surety, *see* ECF No. [80-1], Plaintiff asserts, and Defendants do not dispute, that the A3 Bonds impose the same default requirement. *See* ECF No. [129] at 19-20; ECF No. [142] at 16-17. As such, the Court will assume *arguendo* that both sets of bonds require that, as a condition precent to a valid demand on the surety, the obligee declares a default and that the subcontractor has actually defaulted on the Subcontracts.

*Bd. of Escambia Cnty., Fla.*, 110 F. Supp. 2d at 1354 (explaining that "[w]hen it became apparent that [the subcontractor] breached its contact, the [obligee], assuming it wanted to protect its rights under the performance bond, could not contract with another party to remove the debris prior to giving [the surety] notice" and "an opportunity to remedy the default"); *PCL Constr. Servs., Inc.*, 2012 WL 13102409, at *6 (finding that the obligee would be in material breach of the bond if it "unilaterally hired alternate contractors to complete the Subcontract without first giving [the surety] the opportunity to exercise its completion options under the Bonds"); *Arch Ins. Co. v. John Moriarty & Assocs. of Fla., Inc.*, 223 F. Supp. 3d 1275, 1277 (S.D. Fla. 2016) (same); *N. Am. Specialty Ins. Co. v. Ames Corp.*, No. 09-80966-CIV, 2010 WL 1027866, *2-4 (S.D. Fla. Mar. 18, 2010) (finding that the obligee voided the bond where it (1) allowed the subcontractor to fully complete its contractual obligations and (2) unilaterally began supplemental and remedial work without declaring a default or allowing surety an opportunity to perform).

Defendants argue that the general prohibition against an obligee unilaterally hiring a contractor to perform remedial subcontract work does not apply to the Bonds here because there is no provision in the Bonds or Subcontracts that require Defendants to first give Plaintiff notice or an opportunity to complete the Subcontracts before using an alternative contractor to supplement or remedy the subcontracted work. *See* ECF No. [123] at 11; ECF No. [142] at 8; ECF No. [150] at 2-3.[11] Notwithstanding Defendants' contention to the contrary, the plain language of the Bonds precluded Defendants from remedying R&S's materially inadequate or incomplete work through any means other than those expressly provided under the Bonds.

---

[11] While Defendants suggest that Plaintiff is the party making haphazard arguments, Defendants fail to cite a single case where a court has concluded an obligee or its agents has an independent right to unilaterally complete a subcontract without either an express bond provision providing such a right or the obligee first providing the surety an opportunity to complete the subcontract. *See generally* ECF Nos. [123], [142], and [150].

### a. The Governing Bond Provisions.

Sections 3 and 5 of the Bonds set forth the procedures Defendants were required to adhere to in the event they believed R&S Concrete's deficient work constituted a default that would require a new contractor to remedy or otherwise complete the Subcontracts.[12] Section 3 of the Bonds provides that:

1. [T]he Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this [§] 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

2. [T]he Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

3. [T]he Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

ECF No. [124] at ¶ 15 (quoting ECF No. [80-4] at 3, 13, 23, 33 § 3).

Under § 3.1, Defendants are first required to provide notice that they are considering declaring a contractor default.[13] If the parties are unable to resolve the obligee's concerns about

---

[12] Although the Coastal Bonds use slightly different language than § 3 and § 5 of the A3 Bonds to describe the notice requirements and completion rights, neither party contends that the Coastal Bonds or A3 Bonds impose materially different procedures, rights, or obligations. Compare ECF No. [80-1] (Coastal Bonds) with ECF No. [80-4] (A3 Bonds). The only noteworthy difference the parties have identified is that the A3 Bonds require termination of the R&S Subcontracts before Plaintiff's performance obligations are triggered, while the Coastal Bonds do not. *See* ECF No. [129] at 4. Because neither party's Motion turns on whether the Subcontracts were properly terminated, the Court will primarily use the A3 Bond language for its analysis, with the understanding that the reasoning applies equally to both the A3 Bonds and the Coastal Bonds.

[13] The Court acknowledges that § 4 of the A3 Bonds clarifies that a "[f]ailure on the part of the Owner to

20

any defective or incomplete work under the Subcontracts, Defendants only option is to exercise their rights under § 3.2 and declare a default, terminate the Subcontracts, notify Plaintiff of the Default, and pay the balance of the Subcontract price as proscribed under § 3.3.

Upon Defendants' satisfaction of the conditions set forth in § 3, Plaintiff's surety obligations are triggered, along with Plaintiff's exclusive right to choose from one of the following completion options under § 5 of the Bonds:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances: (.1) After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or (.2) Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

---

comply with the notice requirement in [§] 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligation, or release the Surety from its obligations, except to the extent the Surety's demonstrates actual prejudice." ECF No. [80-4] at 3. However, the case law reflects that a surety is prejudiced by the lack of notice or unilateral supplementation where the conduct deprives the surety of its ability to exercise its completion options under the bond. *See N. Am. Specialty Ins. Co. v. Ames Corp.*, No. 08-80966-CIV, 2010 WL 1027866, at *8 n.7 (S.D. Fla. Mar. 18, 2010) (finding prejudice presumed) (citing *Sch. Bd. of Escambia Cnty., Fla.*, 110 F. Supp. 2d at 1354). Accordingly, the Court finds that § 3.1 was a necessary condition precedent, given that the record reflects that Defendants' failure to provide prompt notice prejudiced Plaintiff's ability to fully exercise its rights under the Bonds.

*Id.* at ¶ 17 (quoting ECF No. 80-4 at 3, 13, 23, 33 § 5).[14]

### b.  Material Breach of § 3 of the Bonds

The procedures outlined in § 3 and § 5 were the Bonds' exclusive remedial tools in the event Defendants determined that R&S was in default and unable to complete the Subcontracts. No provision in the Bonds or the Subcontracts suggests that, in lieu of the notice and default procedures in § 3 and § 5, Defendants could instead select an alternative or supplemental remedy not expressly provided for under the Bonds. *See generally* ECF No. [80-1]; ECF No. [80-4]. Defendants therefore lacked any contractual basis to unilaterally hire a replacement or supplementary contractor, even if they reasonably believed such a course of action was a more efficient and cost-effective means of completing the Subcontracts. Consequently, because the Bonds governed how the parties were permitted to handle a default, once Defendants considered declaring R&S in default (i.e., when Defendants determined they would likely need a replacement or supplemental contractor to complete Subcontracts), § 3.1 required Defendants to promptly provide notice to Plaintiff of the potential default. And if Defendnats ultimately determined that R&S had defaulted on the Subcontracts, § 3.2 required them to declare a default to ensure that Plaintiff was afforded its right to investigate the default and elect one of its completion options under § 5. *See Sch. Bd. of Escambia Cnty., Fla*, 110 F. Supp. 2d at 1354; *Int'l Fidelity Ins. Co. v. Americaribe–Moriarty JV*, 681 Fed. App'x. 771, 776 (11th Cir. 2017) (holding that obligee did not have the right to hire a replacement contract "without first allowing [the surety] an opportunity to exercise its rights under the performance bond);[15] *cf. Pete Vicari Gen. Contractor, LLC v. Ohio*

---

[14] the specific language of the notice, default, and surety provisions in the Coastal Bonds is on page three of this Opinion. *See also* ECF No. [80-1] at 1.

[15] In *Int'l Fidelity Ins. Co.*, the Eleventh Circuit concluded that the obligee's decision to hire an alternate contractor to complete the subcontract immediately after the obligee had terminated the original subcontractor "thwarted [the surety's] ability to choose among the options it had for remedying [the

*Cas. Ins. Co.*, No. 17-23733-CIV, 2019 WL 13224959, at *15 (S.D. Fla. Feb. 8, 2019) (noting that an obligee materially breaches a bond when it hires a replacement contractor to commence work prior to the obligee satisfying its § 3 obligations).[16] Accordingly, Defendants' decision to preemptively and unilaterally hire Suffolk to complete the Subcontracts before notifying and ultimately declaring a default of the Subcontracts constitutes a material breach of § 3.1 and § 3.2. *See CC-Aventura, Inc. v. Weitz Co., LLC*, No. 06-21598-CIV, 2008 WL 2937856, at *2 (S.D. Fla. July 14, 2008) ("failure to adhere to a performance bond notification requirement is a material breach") (quoting *Sch. Bd. of Escambia Cnty., Fla*, 110 F. Supp. 2d at 1353).

Indeed, the case law reflects that an obligee's unilateral completion of a subcontract amounts to a material breach, even where there was no provision explicitly precluding an obligee from electing an alternative contractor prior to a declaration of default. *See, e.g.*, *Ins. Co. of N. Am. v. Metro. Dade Cnty.*, 705 So. 2d 33, 35 (Fla. 3d DCA 1997) (finding material breach even though there was no bond provision expressly prohibiting the obligee from unilaterally hiring an alternate contractor to complete the work); *United States for Use & Benefit of GLF Constr. Corp. v. FEDCON Joint Venture*, No. 817CV01932T36AAS, 2019 WL 5295329, at *28 (M.D. Fla. Oct. 18, 2019) (citing *PCL Construction Services, Inc.*, 2012 WL 13102409, to support the conclusion that an obligee must first give surety an opportunity to exercise completion options even where the bond does "not expressly require[ ] the contractor-obligee to provide notice of its intent to hire alternate contractors").

---

subcontractor's default under § 5 of the bond." 681 Fed. App'x at 776-77. Here, the timing of the hiring was even more detrimental, as Suffolk was hired and began correcting and completing the subcontracted work years before Defendants formally declared the default necessary to trigger Plaintiff's completion rights.

[16] Both § 3 of the Bonds in this case, and § 3 of the bond at issue in the *Pete Vicari Gen. Contractor, LLC* case, include nearly identical notice and default language. *See* 2019 WL 13224959 at *12-13.

The only scenario where Florida courts have found that an obligee could unilaterally complete a subcontract without first notifying the surety or providing the surety with an opportunity to exercise its completion options is where the bond at issue expressly provides an obligee with such authority. *See e.g., Dooley and Mack Constr., Inc.*, 972 So. 2d at 895 (finding no notice to surety was necessary prior to obligee unilaterally completing the subcontract because there was an explicit provision in the bond allowing for unilateral completion, which did not require prior notice). Here, there is no provision in the Subcontracts or the Bonds that affords Defendants the express right to supplement, remedy, or otherwise unilaterally complete R&S's defective work without first seeking Plaintiff's consent.[17] As such, the *Dooley* exception does not apply. The Court therefore concludes that, as a matter of law, Defendants' failure to promptly notify Plaintiff of a potential default in accordance with § 3.1, and Defendants' subsequent delay in declaring a default in accordance with § 3.2, prevented Plaintiff from exercising its contractual right to complete the Subcontracts in a manner Plaintiff determined would most effectively mitigate damages. Because Defendants' conduct deprived Plaintiff of its core surety rights, Defendants materially breached § 3.1 and § 3.2 of the Bonds. *See Ins. Co. of N. Am.*, 705 So. 2d at 35 (noting that lack of notice amounts to a material breach as it strips "the surety of its contractual right to minimize damages"); *Arch Ins. Co.*, 223 F. Supp. 3d at 1277 ("There can thus be no dispute that [the obligee] never allowed [surety] to mitigate its damages by arranging for the completion of the subcontract itself. By depriving [the surety] of its completion options, [obligee] materially breached the bond.").

---

[17] Defendants baldly assert that they have a "separate and independent right to supplement R&S Concrete's work to mitigate delay and maintain progress." ECF No. [142] at 8. Defendants do not point to any case law, nor do they identify any provision in the Bonds or Subcontracts that would suggest they have such a right.

### c.   Material Breach of § 5 of the Bonds

Furthermore, the undisputed material facts establish that Defendants breached § 5 of the Bonds by unilaterally hiring Suffolk to provide supplemental and remedial work before first giving Plaintiff an opportunity to complete the Subcontracts. As early as October 15, 2020, Defendants decided to make Suffolk "'solely responsible' for the 'timely' and 'proper' completion of R&S's work." ECF No. [130] at ¶ 13. The agreement between Suffolk and Defendants was unquestionably for the purpose of remedying deficiencies in R&S's work, given that Suffolk backcharged R&S for the work and was paid with funds from the Subcontracts. Accordingly, since the quality and costs of Suffolk's remedial work could reasonably impact Plaintiff's right to exercise its bargained-for completion options under the Bonds, Defendants had an obligation under § 5 of the Bonds to first provide Plaintiff with an opportunity to exercise those completion options before Defendants could direct Suffolk, or any other party, to complete or remedy R&S's work on the Project. By failing to respect Plaintiff's exclusive rights, Defendants materially breached § 5 the Bonds.

Even if the Bonds' default procedures were not triggered until September 23, 2021, when Defendants first provided Plaintiff notice that they were considering declaring R&S in default, Defendants' conduct would still amount to a material breach of contract. From September 23, 2021, to September 8, 2023, when Defendants finally declared a formal default on the Subcontracts, Suffolk had long been "incur[ing] significant costs in remedying R&S Concrete's defective and nonconforming work." Because Defendants decided to delay declaring a default,[18]

---

[18] While Defendants contend that a deprivation of a surety's completion rights is only material where the deprivation is "intentional," Defendants offer no case law or other authorities to support that argument. Defendants rely solely upon the trial court's decision in *Venetian Multi Family LLC v. Wieland Corp.,* Case No. 19-CA-004395, at 14-15 (Fla. 20th Cir. Ct. May 26, 2022), where the court found the obligee's "intentional" delay in declaring a default was an independently sufficient ground for finding a breach of the bond at issue. Nowhere in that opinion, however, did the court conclude that an "intentional" delay is a prerequisite to finding a material breach of a surety's completion rights. Rather, the court determined that the bond required "a prompt declaration of default and time for [the surety] to elect its options without

and instead attempted to ameliorate R&S's defective work themselves, Defendants deprived Plaintiff of its bargained-for right to decide the most expedient and cost-effective means of completing the Subcontracts. *See Seawatch at Marathon Condo. Ass'n, Inc. v. Guarantee Co. of N. Am.*, 286 So. 3d 823, 827 (Fla. 3d DCA 2019) (citing *St. Paul Fire & Marine Ins. Co. v. City of Green River, Wyo.*, 93 F. Supp. 2d 1170, 1178 (D. Wyo. 2000) (explaining that when a surety is prevented from assuming responsibility for completing a contract, the surety is deprived of its bargained-for right to "minimize liability by selecting the lowest cost option and by directing the construction, or participating in the contractor selection process… in other words, such conduct infringes on the surety "freedom to assemble the project team of its choosing").

While Defendants argue that Plaintiff still maintained its full panoply of completion options when Defendants finally declared a default, Defendants ignore or fail to appreciate the impact their decision had on Plaintiffs' ability to finish the Subcontracts. By having Suffolk provide remedial work before triggering Plaintiff's § 5 rights, Defendants prevented Plaintiff from potentially hiring a better or more cost-effective contractor to remedy the work Suffolk had supplemented and repaired during the prior three years. Furthermore, Defendants' unilateral decision to pay for Suffolk's supplemental work utilizing the remaining Subcontract funds precluded Plaintiff from being able to use those funds to complete the Subcontracts before being forced to potentially pay out of pocket.[19] Consequently, because Defendants' conduct deprived

---

exceptions to this process." *Id.* at 14. The court concluded that, given the bond's requirement, the obligee's intentional decision to prevent the surety from electing a completion option constituted a material breach of the bond. Importantly, the court in *Venetian* did not inject a mental state requirement into its breach of contract analysis, nor did it rely on any cases suggesting that the deprivation of a surety's completion rights must be intentional before such conduct amounts to a material breach. Accordingly, the Court rejects Defendants' invitation to impose an intentionality requirement here.

[19] Defendants insist Plaintiff was not undercut from exercising its completion rights because it was "allowed to investigate the site and participate in pre-default discussions" leading up to the declaration of default and could have intervened earlier if it wished to do so but instead remained on the sidelines. ECF No. [150] at

Plaintiff of "its ability to protect itself pursuant to performance options granted under [the Bonds]" in the time leading up to the formal declaration of default, Defendants materially breached § 5 the Bonds.[20] *PCL Constr. Servs., Inc.*, 2012 WL 13102409, at *6.[21]

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, **ECF No. [123]**, is **DENIED**.

2. Plaintiff's Motion for Partial Summary Judgment as to Liability, **ECF No. [129]**, is **GRANTED**.

3. Summary judgment is granted in favor of Plaintiff and against Defendants as to **Counts I, III, V, VII, IX, XI, XIII, and XV** of the Third Amended Complaint, **ECF No. [80].**

4. This matter shall proceed to trial as currently scheduled on the remaining issue of damages.

5. The Parties' Joint Motion for Case Management Conference, **ECF No. [158]**, is **GRANTED**. The parties shall appear in person for a Case Management Conference on **March 12, 2026, at 2:00 p.m.**

---

5-6. However, Defendants ignore the fact that Plaintiff could not exercise any completion rights until Defendants formally declared a default under § 3 of the Bonds. *See PCL Constr. Servs., Inc.*, 2012 WL 13102409, at *5 (noting that "sureties face possible tort liability for meddling in the affairs of their principals . . . "before a legal declaration of default is made"). Accordingly, the Court finds Defendants' argument without merit.

[20] Defendants argue that Plaintiff's "theory is not a proper basis for summary judgment because there is no pending claim on the Bonds, and [Plaintiff's] argument would, at most, operate as a defense to a bond claim that has not been asserted." ECF No. [142] at 7. However, Defendants once again offer no case law to support this conclusion.

[21] Since the Court has determined, based on Plaintiff's first theory of liability, that Defendants materially breached the Bonds as a matter of law, the Court need not address Plaintiff's remaining theories of breach here.

Case No. 23-cv-23524-BLOOM/Torres

**DONE AND ORDERED** in Chambers at Miami, Florida, on **March 6, 2026**.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

28