**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-23524-BLOOM/Torres**

ARCH INSURANCE COMPANY,

Plaintiff,

v.

A3 DEVELOPMENT, LLC, a foreign Limited liability company; A3 NORTH DEVELOPMENT, LLC, a foreign limited A liability company; and A3 AMENITIES, LLC, a foreign limited liability company,

Defendants.
_________________________________/

**ORDER ON DEFENDANTS' MOTION TO FILE A CONFORMING STATEMENT OF FACTS AND FOR RECONSIDERATION OF THE COURT'S OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ECF NO. 159**

**THIS CAUSE** is before the Court upon Defendants A3 Development, LLC, A3 North Development, LLC, and A3 Amenities, LLC's ("Defendants") Motion to File a Conforming Statement of Facts and for Reconsideration of the Court's Omnibus Order on Cross Motions for Summary Judgment ECF No. 159 ("Motion"), ECF No. [171]. Plaintiff filed a Response in Opposition, ECF No. [173]. The Court has reviewed the Motion and related submissions and is otherwise fully advised. For the reasons that follow, Defendants' Motion is denied.

## I. BACKGROUND[1]

On March 6, 2026, the Court issued its Omnibus Order on Cross Motions for Summary Judgment. ECF No. [159] ("Omnibus Order"), denying Defendant's Motion for Summary

---

[1] For purposes of brevity, the Court does not undertake to provide a full account of the facts of the case. For a more in-depth summary of the facts, see the Background section in the Court's Omnibus Order. Capitalized terms not defined in this Order are drawn from the Omnibus Order.

Judgment, ECF No. [123], and granting Plaintiff's Motion for Partial Summary Judgment as to Liability, ECF No. [129]. *Id.* at 1. The Court found that Defendants' unilateral decision to hire Suffolk and use the remaining Subcontract funds prior to declaring a default constituted a material breach of the Bonds. *Id.* at 18. Indeed, the Court explained as follows:

> Florida courts have consistently found that an obligee's unilateral decision to hire an alternate contractor to complete a subcontract without first giving the surety proper notice of a default and an opportunity to exercise its completion options deprives a surety of its ability to protect itself and, therefore, such conduct constitutes a material breach of the bond.

*Id.* (citations omitted). This is true even where there is no provision in the Bonds or Subcontracts that affirmatively requires Defendants to first give Plaintiff notice or an opportunity to complete the Subcontracts before using an alternative contractor to supplement or remedy the contracted work. *Id.*

Specifically, the Court found that Defendants materially breached § 3 of the Bonds because they went outside the "exclusive remedial tools" available in the event of a default by R&S and pursued an "alternative or supplemental remedy not expressly provided for under the Bonds." *Id.* at 22. Section 3.1 required Defendants—in the event that they considered declaring R&S in default—to promptly provide notice to Plaintiff of the potential default. *Id*. Once the Defendants determined R&S had defaulted on the Subcontracts, § 3.2 required Defendants to declare a default to ensure that Plaintiff was able to exercise its right to investigate the default and elect one of its completion options under § 5. *Id.* In lieu of taking those steps, Defendants "preemptively and unilaterally" hired Suffolk to complete the Subcontracts *before* notifying and ultimately declaring a default. *Id.* at 23. This constituted a material breach. *Id*. Florida courts have found such breaches even in the absence of a specific provision preventing an obligee from electing an alternative contractor prior to declaring a default. *Id.* (citations omitted). The only situation in which Florida

courts have permitted an obligee to unilaterally complete without first notifying the surety or allowing the surety to exercise completion rights is where the bond at issue expressly provides as much. *Id.* at 24 (citing *Dooley and Mack Constr., Inc. v. Developers Sur, and Indem. Co.*, 972 So. 2d 893, 895 (Fla. 3d DCA 2008)). Such a provision is not found in the Subcontracts or Bonds at issue here. *Id*. Therefore, by not promptly notifying Plaintiff of a potential default and by delaying declaring default until after work had been undertaken by Suffolk, Defendants breached § 3.1 and § 3.2 of the Bonds.

The Court also found that Defendants breached § 5 of the bonds "by unilaterally hiring Suffolk to provide supplemental and remedial work before first giving Plaintiff an opportunity to complete the Subcontracts." *Id.* at 25. As early as October 2020, the Court found, Defendants had decided to work with Suffolk for purposes of completing the work under the Subcontracts. *Id*. Because "the quality and cost of Suffolk's remedial work could reasonably impact Plaintiff's right to exercise its bargained-for completion options under the Bonds, Defendants had an obligation under § 5 of the Bonds" to first give Plaintiff an opportunity to elect a completion option. *Id*. By September 2021—when Defendants first provided Plaintiff notice that they were considering declaring R&S in default—Defendants' decision to work with Suffolk was unquestionably a breach. *Id*. The Court found unpersuasive Defendants' argument that Plaintiff still maintained its completion options when Defendants declared a default, largely because Defendants' decision impacted Plaintiff's ability to finish the Subcontracts on its own terms, which may have been "better or more cost-effective." *Id*. at 26. Furthermore, Defendants depleted the remaining Subcontract funds in paying Suffolk, thereby reducing the funds that should have rightly been available to Plaintiff to complete the Subcontracts. *Id*.

On April 8, 2026, Defendants filed the instant Motion. ECF No. [171], advancing three primary arguments. First, they contend that the Court's decision to disregard their response to Plaintiff's Statement of Material Undisputed Facts for failure to conform with the Local Rules was improper, as it led the Court to ignore "genuine factual disputes that [Defendants] had placed before the Court in its own statement of facts, ECF Nos. 124/143 and opposition memorandum of law, ECF No. 142." *Id.* at 2.

Second, Defendants argue that the Court improperly distinguished *Dooley* on the basis that Defendants "had not identified any contractual provision authorizing supplementation." *Id*. This was in error, as the underlying Subcontracts contained "multiple provisions authorizing" Defendants "to complete and or correct deficient work and backcharge R&S (without notice to [Plaintiff])." *Id.*

Finally, Defendants argue that the Court's Omnibus Order contains an internal inconsistency—it found a breach of Section 5 during a time when the Court found that Plaintiff "could not exercise any completion rights." *Id*. (quoting ECF No. [159] at 27 n.19).

Plaintiff, in its Response in Opposition, characterizes Defendants' Motion as a "classic attempt at a 'do over'" that is expressly not permitted in a motion for reconsideration. ECF No. [173] at 1. Defendants' Motion, Plaintiff contends, does not contain "support in case law or new evidence." *Id.* at 2. Instead, it attempts to rely on *Dooley*, a case not previously relied upon, but that case "does not apply because it involved materially different contract and bond language that did not include the mandatory conditions precedent that must occur before [Plaintiff] had any obligation or could be subject to any remedy." *Id.*

In their Reply, Defendants reiterates, first, that the Omnibus Order deemed facts admitted that were contradicted by Defendants' conforming statement of material facts. ECF No. [178] at 2.

Second, Defendants contend that *Dooley* compels a different result than the Court reached, because the Subcontracts here specifically provide for supplementation without notice to Plaintiff. *Id*. Finally, the Omnibus Order erred in misunderstanding the role of Suffolk on the project: "Suffolk was not hired to supplement or correct R&S's work. Suffolk was retained as the general contractor for the entire Project and, in that role, was responsible for overseeing overall project completion—a responsibility that necessarily includes addressing issues, supplementation, and corrections of subcontractors' work." *Id*.

## II. LEGAL STANDARD

A motion for reconsideration is "an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002). "The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Saint Croix Club of Naples, Inc. v. QBE Ins. Corp*., No. 2:07-cv-00468-JLQ, 2009 WL 10670066, at *1 (M.D. Fla. June 15, 2009) (citing *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F. Supp. 1072, 1073 (M.D. Fla. 1993)).

> A motion for reconsideration must do two things. First, it must demonstrate some reason why the court should reconsider its prior decision. Second, it must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.

*Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294, 295 (M.D. Fla. 1993) (citations omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369.

Because court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure," a motion for reconsideration must clearly "set forth facts or law of a strongly convincing nature to demonstrate to the Court the reason to reverse its prior

decision." *Am. Ass'n of People With Disabilities v. Hood*, 278 F. Supp. 2d 1337, 1339, 1340 (M.D. Fla. 2003) (citations omitted). As such, a court will not reconsider its prior ruling without a showing of "clear and obvious error where the 'interests of justice' demand correction." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, No. 6:11-cv-1637-Orl-31, 2013 WL 425827, at *1 (M.D. Fla. Feb. 4, 2013) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assoc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)). "When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinning upon which the decision was based." *Taylor Woodrow Constr. Corp.*, 814 F. Supp. at 1072-73; *see also Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1247 n.2 (S.D. Ala. 2008) (noting that reconsideration motions are to be used sparingly, and stating, "imagine how a district court's workload would multiply if it w[ere] obliged to rule twice on the same arguments by the same party upon request").

A motion for reconsideration "is not an opportunity for the moving party . . . to instruct the court on how the court 'could have done it better' the first time." *Hood v. Perdue*, 300 F. App'x 699, 700 (11th Cir. 2008) (citation omitted). Thus, a motion to reconsider is "appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Kapila v. Grant Thornton, LLP*, No. 14-61194-CIV, 2017 WL 3638199, at *1 (S.D. Fla. Aug. 23, 2017) (quoting *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (internal quotation marks omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369. Ultimately, reconsideration is a decision that is "left 'to the sound discretion' of the reviewing judge." *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, No. 6:18-cv-1149-Orl-78DCI, 2020 WL 5534280, at

*2 (M.D. Fla. Apr. 1, 2020) (quoting *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993)).

## III. DISCUSSION

### A. Defendants' Response to Plaintiff's Statement of Material Undisputed Facts

In connection with its Motion for Partial Summary Judgment as to Liability, ECF No. [129], Plaintiff filed a Statement of Material Undisputed Facts, ECF No. [130]. In response, Defendants filed their own responsive statement of material facts, ECF No. [143].

Local Rule 56.1(b)(2) required that this responsive filing should "correspond with the order and paragraph numbering" of Plaintiff's filing, use the word "disputed" or "undisputed" as the first word in each paragraph-by-paragraph-response, and provide "specific evidentiary citations supporting" Defendants' position. Rather than doing so, Defendants simply refiled the Statement of Material Facts upon which they relied in support of their own Motion for Summary Judgment. *Compare* ECF No. [124] *with* ECF No. [143]. As a result of this nonconformity, the Court treated Plaintiff's Statement of Material Undisputed Facts, ECF No. [130], as admitted to the extent that the facts alleged therein were "properly cited evidence and not contradicted by Defendants' properly filed Statement of Material Facts." ECF No. [159] at 2 (citations omitted).

Defendants, in their Motion, now argue that Defendants' properly filed Statement of Material Facts, ECF No. [124] ("Defendants' SMF"), contained allegations that contradicted Plaintiff's Statement of Material Undisputed Facts, ECF No. [130] ("Plaintiff's SMF"), ECF No. [171] at 5, and that the Court, in error, "accepted as undisputed certain information that was otherwise challenged or contradicted." *Id.* Specifically, Defendants contend that Defendants' SMF contradicts three allegations from Plaintiff's SMF that the Court deemed admitted. *Id.* at 5–6. First, it contradicts that supplementation of R&S' work occurred without notice to Plaintiff by clarifying that notice was not required under the Subcontracts; once "the performance of R&S became a more

significant issue," Defendants issued the notice required by § 3.1, and a pre-default meeting was held. *Id.* at 6. Second, Defendants contend that Defendants' SMF contradicts the allegation in Plaintiff's SMF that Defendants never responded or tendered any Subcontract funds. *Id*. Defendants' SMF states that in the September 8, 2023 Notice of Default, Defendants expressly stated that they agreed to pay Plaintiff the balance of the Subcontract price. *Id*. Third, Defendants argue that Defendants' SMF contradicts the allegation in Plaintiff's SMF that Defendants' Change Order-001 with Suffolk made Suffolk "solely responsible" for R&S' work. *Id*. Defendants argue that the Change Order-001 "simply clarified that although R&S contracted with [Defendants], Suffolk remained responsible for the work of R&S (both as to quality and timing)." *Id*.

Defendants contend that each of these factual matters underpinned an important finding by the Court. *Id.* at 7. The first factual finding—that Defendants did not give Plaintiff notice before supplementing R&S' work—supported the Court's finding that Defendants acted "preemptively and unilaterally." *Id*. The second factual finding—that Defendants "never responded or tendered" Subcontract funds—supported the Court's finding that Defendants failed to satisfy § 3.3 of the Bonds. And the "solely responsible" characterization supported the Court's finding that Defendants' relationship with Suffolk represented a "replacement" of R&S. *Id*.

Plaintiff responds that the Court expressly stated that it *was* considering Defendants' SMF. ECF No. [173] at 3–4. Moreover, Defendants admit that the nonconforming statement of facts not considered by the Court was "nearly identical" to Defendants' SMF, which the Court *did* consider—thus, there is no reason why the Court should allow Defendants to now file a conforming statement of facts. *Id.* at 4.

Turning to the specific factual disputes that Defendants raise, Plaintiff contends that nothing in what Defendants put forward "contest[s] that the events and correspondence occurred."

*Id.* at 5. As to the first allegedly disputed fact, Defendants do not actually contest that they did not provide notice of the work completed prior to September 21, 2021; they merely "repeat[]" their legal argument that they did not have to provide notice to comply with the Bonds—"a legal point this Court already rejected." *Id*. Defendants do not actually dispute that "$5 million worth of work had already been done by the time" the initial letter requesting a pre-default meeting was sent. *Id*. Nor do Defendants dispute that they "waited two (2) *more* years and depleted $12 million of *Subcontract* funds before issuing the formal default/termination." *Id*. That is, the facts themselves are not disputed, only the legal conclusions related to them. *Id*.

With respect to the second fact purportedly in dispute—that Defendants made Suffolk "solely" responsible for completing R&S' work—Plaintiff points out that Defendants do not dispute that Change Order-001 was signed, that the Settlement Agreement between Defendants and Suffolk provided for Suffolk to complete the work, that Defendants paid Suffolk $3.3 million in Subcontract funds, or that Defendants later spent over $12 million for Suffolk to complete R&S' work. *Id*. Indeed, Plaintiff points out that Defendants admitted "Suffolk remained responsible for the work of R&S" and "was required to address any subcontractor performance issues including those pertaining to R&S," even though Suffolk never had a contract with R&S. *Id.* at 6. Thus, there is no real argument over whether Suffolk took over and completed R&S' work. *Id*.

Finally, as to Defendants' purported dispute regarding whether Defendants tendered Subcontract balances to Plaintiff, Plaintiff points out that before Defendants' September 8, 2023 letter declaring R&S in default, Defendants had already told Plaintiff that they had spent over $12 million and that no Subcontract funds would be tendered, which Plaintiff confirmed in writing. *Id*. Defendants do not dispute this. *Id*.

In their Reply, Defendants reiterate their contention that the Court "accepted several of [Plaintiff]'s characterizations as undisputed, even where [Defendants]'s own prior filings directly contradicted them." ECF No. [178] at 4. Defendants argue that its proposed conforming statement of facts "does not raise new arguments or introduce new evidence; it simply presents the same record evidence in the format the Local Rules require." *Id.*

Turning to the specific purported factual disputes, Defendants contend that their proposed conforming statement of facts makes clear, first, that "corrective and supplemental work without notice to [Plaintiff] did not violate the Subcontracts or Bonds." *Id.* at 5 (citations omitted). In particular, the Subcontracts contemplated Defendants correcting deficient work and backcharging R&S without notice to Plaintiff. *Id.* With respect to the second factual contention, Defendants contend that their statements of fact show that Suffolk was not a "completion contractor" for R&S but was instead the general contractor the entire project. *Id.* Change Order-001, which formalized this relationship, did not transform Suffolk into a replacement for R&S. *Id.* Finally, Defendants argue that Plaintiff's facts are incomplete; when Plaintiff sought clarification on the exact amount being tendered, it gave Defendants "barely 24 hours to respond to a detailed accounting request." *Id.* at 6. Moreover, Defendants point out that there is "no requirement that [Defendants] actually tender the funds *prior* to [Plaintiff] making its selection under Section 5." Id.

The Court agrees with Plaintiff and declines to reconsider its initial ruling disregarding Defendants' nonconforming statement of material facts. As an initial matter, Defendants' responsive statement of facts did not comply with Local Rule 56.1(b)(2), and Eleventh Circuit precedent plainly permits a Court to disregard nonconforming statements of fact, including those which do not respond to the initial statement of fact but instead presents their own facts. *BMU, Inc. v. Cumulus Media, Inc.*, 366 F. App'x 47, 49 (11th Cir. 2010); *see also Warth v. Gwinnett*

*Cnty. Pub. Schs.*, No. 25-13391, 2026 WL 574974, at *8 (11th Cir. Mar. 2, 2026). Defendants' failure to comply "is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Defendants fail to show a misapprehension of law in the Court's conclusion that exclusion of the nonconforming statement was warranted. As such, the Court sees no reason to revisit its decision to disregard Defendants' nonconforming statement of facts, nor does it see any reason to permit Defendants to *now* submit a conforming statement of facts.

This conclusion is reinforced by the fact that the Court *did* consider Defendants' SMF, ECF No. [124], which Defendants admit is "nearly identical" to the nonconforming statement of facts, ECF No. [143]. As such, the Court had at its disposal everything Defendants would have had the Court consider in its nonconforming statement of facts. Defendants appear to argue that the Court did not actually consider Defendants' SMF in its analysis. That contention is incorrect, and a survey of the purported points of conflict between Plaintiff's SMF and Defendants' SMF shows this.

First, it is true that the Court did accept Plaintiff's assertion that no notice was given before supplementation of R&S's work occurred. ECF No. [159] at 7 (citing ECF No. [30] ¶ 14). But Defendants point to nothing in Defendants' SMF that contradicts this. Indeed, Defendants point to nothing in *Defendants' SMF* at all. The implication is that nothing in Defendants' SMF actually contradicts the version of events presented in Plaintiff's SMF, rendering patently reasonable the Court's decision to deem that version of events admitted.[2]

[2] Nor do Defendants allege that anything in their nonconforming statement of facts, ECF No. [143], or their proposed conforming statement of facts, ECF No. [171-1], contradicts that no notice was given prior to starting supplementation work. All Defendants point to are statements of fact regarding notice given in September 2021 and the pre-default meeting that occurred in October 2021. ECF No. 171 (citing ECF Nos. [143] ¶¶ 19–21 and [171-1] ¶¶ 15, 23). But Defendants executed their agreement with Suffolk in October 2020, *a year before* notice of any sort was given. ECF No. [130] ¶ 13. In other words, even if the Court

Defendants' issue with the Court's legal conclusion that notice was required based on the Subcontracts and Bonds is just that—a gripe with a legal conclusion. It is not a challenge to whether the notice actually occurred. And a motion for reconsideration based upon a party's disagreement with the conclusion reached by the Court is improper. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) (recognizing no basis for reconsideration where motion did nothing but ask the court to reexamine unfavorable ruling, absent a manifest error of law or fact).

Turning to Defendants' second point of contention—whether it tendered any Subcontract funds—Defendants contend that Defendants' SMF expressly stated that Defendants "agree[d] to pay Surety or a contractor selected to complete the work, the balance of the subcontract price." ECF No. [171] at 6 (citations omitted). Again, it is true that the Court accepted as true Plaintiff's allegation that Defendants "never responded or tendered any Subcontract funds." ECF No. [159] at 9 (citing ECF No. [130] ¶ 25). Defendants' SMF does allege that in their September 8, 2023 Notice of Default, they agreed to pay the balance of the Subcontract price. ECF No. [124] ¶ 33. But this does not dispute that Plaintiff asked for clarification on September 12, 2023 as to the specific amount that Defendants would be tendering to Plaintiff, and Defendants did not respond or tender any Subcontract funds. ECF No. [130] ¶ 24. Indeed, the facts surrounding this later communication support Plaintiff's claim that Defendants did not respond or tender a definite sum of money, which the Court deemed admitted. As such, the Court is unpersuaded by Defendants' argument that it failed to consider the allegations in Defendant's SMF.[3]

were to consider Defendants' nonconforming statement of facts or proposed conforming statement of facts, its analysis would remain unchanged. At least a year of supplementation work with Suffolk occurred before notice of any kind was sent to Plaintiff.

[3] Moreover, any factual dispute as to this point is irrelevant. The Court's Omnibus Order was not predicated on any failure by Defendants to tender the remaining balances on the Subcontracts to Plaintiff following

Finally, Defendants contend that, contrary to the allegation in Plaintiff's SMF that Change Order-001 made Suffolk "solely responsible" for R&S' work, Defendants' SMF shows that Change Order-001 "simply clarified that although R&S contracted with A3, Suffolk remained responsible for the work of R&S (both as to quality and timing)." ECF No. [171] at 6. In support of their position, Defendants point to a few paragraphs in Defendants' SMF. *Id.* at 7 (citing ECF No. 124 at ¶¶ 3-4, 7, 9, 21–22). However, none of those paragraphs contains any information about Change Order-001. Indeed, Defendants' SMF only mentions Suffolk four times, all in ways that are irrelevant to Change Order-001, have no relationship to what actual work Suffolk did or did not do, and have no bearing on what responsibility Suffolk had over the work to be done by R&S. Nothing in Defendants' SMF disputes "that Change Order 001 was signed, that the Settlement Agreement with Suffolk explicitly provided for Suffolk to perform the work, that [Defendants] paid Suffolk $3.3 million of R&S' Subcontract funds to do so, and that subsequently [Defendants] spent over $12 million in total for Suffolk for the completion of R&S' work." ECF No. [173] at 5. Thus, the Court found—and continues to find—that Plaintiff's allegations regarding Suffolk's connection to R&S' work went entirely uncontradicted and were thus admitted.

At bottom, Defendants have advanced no meaningful legal argument as to why the Court's decision to exclude their nonconforming statement of facts was in error, thereby providing no justification for the Court to allow them to submit a conforming statement of facts *now*. And Defendants fail to point to anything in Defendants' SMF that substantively disputes the facts the

---

Defendants' declaration of default. Instead, because the Court found that Defendants had breached the Bonds by "delaying the declaration of default and unilaterally hiring Suffolk to complete R&S's purportedly defective work without first providing Plaintiff notice or an opportunity to exercise its completion options," ECF No. [159] at 10, the Court expressly declined to reach Plaintiff's theory of breach based on failure to tender the remaining balances. *Id.* at 27. As such, any factual dispute would not affect the Court's conclusion that Defendants breached the Bonds.

Court deemed admitted. As such, the Court declines to reconsider its analysis based on Defendants' purported factual disputes.

**B. Provisions Regarding Supplementation**

In the Court's Omnibus Order, it explained, "The only scenario where Florida courts have found that an obligee could unilaterally complete a subcontract without first notifying the surety or providing the surety with an opportunity to exercise its completion options is where the bond at issue expressly provides an obligee with such authority." ECF No. [159] at 24 (citing *Dooley*, 972 So. 2d at 895). The Court found that, in the instant case, "there is no provision in the Subcontracts or the Bonds that affords Defendants the express right to supplement, remedy, or otherwise unilaterally complete R&S's defective work without first seeking Plaintiff's consent." *Id*. Thus, the Court found, the *Dooley* exception did not apply, and Defendants' actions constituted a breach of the Bonds.

In their Motion, Defendants point to the Coastal / R&S Subcontracts, which they contend "contain the very contractual provisions" that Court found absent in its Omnibus Order. ECF No. [171]. Those Subcontracts were incorporated by reference into the Continuation Agreement. *Id*. Specifically, Defendants point to the following provision in the Coastal / R&S Subcontracts:

> Should Subcontractor at any time fail in the Contractor's opinion in the performance or observance of any of the covenants, conditions, or other terms of this Subcontract, then in any such event, each of which shall constitute a default hereunder by Subcontractor, Contractor shall, after giving Subcontractor written notice of default and forty-eight (48) hours within which to cure said default, have the right to attempt to remedy the default by whatever means Contractor may deem necessary or appropriate, including, but not limited to, correcting, furnishing, performing, or otherwise completing the Work, or any part thereof, by itself or through others (utilizing where appropriate any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) from any monies due or to become due to Subcontractor hereunder . . .

ECF No. [171-2] at 12–13. Defendants argue that this provision "establish[es] a contractual framework authorizing supplementation (in the form of correction and completion of the work) and backcharging, which existed before and independent of the process outlined in Section 3 and Section 5 of the New Bonds." ECF No. [171] at 10. Indeed, Defendants point out, the Subcontracts expressly provide that R&S' sureties—namely, Plaintiff—agree to be bound notwithstanding any provision of the bonds. *Id.* (citing ECF No. [171-2] at 13). This, Defendants argue, shows that this case falls into the exception stemming from *Dooley* that the Court noted. *Id.* at 11.

Defendants contend that a holistic reading of all the relevant contracts reinforces this conclusion. *Id*. The Bonds show that the parties knew how to require Plaintiff's involvement if they intended to; they chose not to involve Plaintiff in the supplementation contemplated in the Subcontracts. *Id*. Moreover, Defendants allege, Plaintiff knew about the Subcontracts because they were incorporated into the Continuation Agreement. *Id*. Plaintiff could have required additional supplementation-related notice, but it did not. *Id*.

Defendants essentially contend that "[t]he Court's observation at footnote 17 of its Order that no provision was cited, ECF No. 159 at 24 n.17, invites correction under Rule 59(e), regardless of whether [Defendants are] permitted to file a reformatted statement of facts." *Id.* at 12.

Plaintiff responds, first, that this portion of Defendants' Motion represents an attempt to "re-state and amplify arguments [] previously made." ECF No. [173] at 7. The Court already resolved that "the Bonds controlled what steps had to be taken before [Plaintiff] could be liable, and that [Defendants] could not use the Subcontracts to manipulate the timing of these steps to unilaterally complete the work and deprive [Plaintiff] of its rights." *Id*. Plaintiff contends that the Court found that Defendants "baldly asserted" their argument with no real explanation, and Defendants now take that "as an invitation to supplement [their] argument by adding additional

discussion of the Subcontracts." *Id*. This, Plaintiff contends, is not appropriate in a motion for reconsideration. *Id.* at 8.

Second, Plaintiff argues that Defendants are substantively wrong. *Dooley*—which Plaintiff points out has been "heavily criticized and rejected by courts in Florida and in other jurisdictions"—was based on "materially different bonds." *Id*. Indeed, the Bonds here are far more favorable to Plaintiff than the bonds in *Dooley*. The Bonds require Defendants to take mandatory steps before Plaintiff's obligation arises and before Defendants can exercise any "remedy." *Id.* at 9. The bond and subcontract in *Dooley*, Plaintiff asserts, "did not have these mandatory provisions regarding when the surety's obligation arises and requiring notice and compliance with other obligations before the surety can be liable." *Id.* at 10. Therefore, Plaintiff contends *Dooley* is inapplicable.

Moreover, Plaintiff points out that the Eleventh Circuit "has already addressed this exact situation and upheld the surety's rights." *Id.* (citing *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 681 F. App'x 771 (11th Cir. 2017) and *CC-Aventura, Inc. v. Weitz Co.*, LLC, No. 06-21598-CIV, 2008 WL 2937856, at *1 (S.D. Fla. July 14, 2008), *aff'd*, 492 F. App'x 54 (11th Cir. 2012)).

Plaintiff contends that, read harmoniously, the Subcontracts offer a remedy of supplementation, but the Bonds determine when Defendants can exercise the remedy. *Id.* at 12. The Subcontracts do not allow Defendants to merely write the Bonds out of existence before Plaintiff even has a chance to perform. *Id*. Furthermore, Plaintiff points out that, in the Continuation Agreement—which modified and *controlled over* the Subcontracts—the parties "bargained for and agreed to the strictest possible conditions before [Plaintiff] could be held liable." *Id.* at 12–13. The parties agreed that the New Bonds would not be governed by the Subcontracts but by the AIA A312 bond form. *Id.* at 13.

Defendants reply that, rather than trying to re-argue their original position, they are simply providing the Court with the specific Subcontract provisions that "the Court's analysis expressly sought." ECF No. [178] at 6–7. Defendants argue those provisions were already part of the record "through the Continuation Agreement's incorporation thereof" and were "referenced throughout the filings in this case." *Id.* at 7.

Furthermore, Defendants argue that the cases cited by Plaintiff support their position. *Id.* *International Fidelity Insurance Company* established that a bond and subcontract "must be read together." *Id.* (citing 681 F. App'x at 775). Here, such "harmonization" shows that Defendants "had the right to supplement under the Subcontracts (without notice to [Plaintiff]), but when invoking [Plaintiff]'s performance obligations under the Bonds, [Defendants] had to follow the Bonds' notice and default procedures—which it did." *Id.* at 7–8.

Moreover, Defendants argue that it does not seek to "ignore" the Bonds. Instead, Defendants argue that the Bonds "govern when [Plaintiff] must perform; the Subcontracts govern when and how [Defendants] may correct R&S' deficient work." *Id.* at 8. They are "complementary frameworks." *Id.* Finally, Defendants argue that nothing in the Continuation Agreement "superseded or displaced the Subcontracts' provisions permitting supplementation and correction of R&S's work." *Id.*

The Court agrees with Plaintiff for two reasons. First, Defendants' admitted failure to provide the Court with the Subcontracts does not mean the Court committed an error justifying reconsideration. This is a classic attempt at a "second bite at the apple." *Benoit v. Sec'y, Fla. Dep't of Corr.*, No. 21-11014, 2022 WL 2743174, at *4 (11th Cir. July 14, 2022). The law dictating when reconsideration is appropriate is clear—reconsideration is warranted where there is: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to

correct clear error or manifest injustice." *Florida College of Osteopathic Medicine, Inc. v. Dean Witter Reynolds, Inc.*, 12 F.Supp.2d 1306, 1308 (M.D. Fla. 1998). As explained in *Gonzalez v. Secretary for the Department of Corrections*, 366 F.3d 1253, 1292 (11th Cir. 2004), motions for reconsideration are not "intended to permit parties to relitigate the merits of claims or defenses, or to raise new claims or defenses that could have been asserted during the litigation of the case. Rather, the aim of [a motion for reconsideration is] to allow a district court to grant relief when its judgment rests upon a defective foundation."

Here, there has been no change in controlling law. Furthermore, the evidence that Defendants seek to admit is not new; indeed, Defendants have had access to the Subcontracts for years and failed to make them part of the record. *Benoit*, 2022 WL 2743174, at *4 (11th Cir. July 14, 2022) (denying reconsideration where "the 'evidence' relied upon is not newly discovered" (citations omitted)). "[W]here a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion." *Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997). To hold otherwise would encourage litigants to withhold evidence until after losing, which is entirely destructive of judicial economy and fairness.[4]

And Defendants advance no argument regarding clear error or manifest injustice; indeed, the Court's reasoning was proper based on the record evidence before it. Nor could Defendants advance such an argument, because the Court's reasoning would remain unchanged even with

---

[4]Defendants' argument that the Subcontracts were "already part of the record" because they were incorporated by reference into the Continuation Agreement, ECF No. [178] at 7, is unpersuasive. A reference to an agreement in another document is not tantamount to the Court having the agreement before it. Without access to the actual document, the Court was left with "bald[] assert[ions]" regarding Defendants' rights. ECF No. [159] at 24 n.17.

Moreover, it is worth noting that even now, Defendants provide only an unsigned, excerpted portion of the Subcontracts. *See* ECF No. [171-2].

consideration of the Subcontracts. Indeed, *International Fidelity Insurance Company* and *CC-Aventura*—both of which the Court cited in its Omnibus Order—are highly instructive here. Both cases plainly found that the obligees had not complied with the bonds' notice and remedial action requirements by unilaterally remediating the subcontractors' work without notifying the surety.

Defendants' attempts to circumvent the obvious implication of those cases are unavailing. Defendants argue that a harmonious reading of the Subcontracts and Bonds "yields the following result: [Defendants] had the right to supplement under the Subcontracts (without notice to [Plaintiff]), but when invoking [Plaintiff]'s performance obligations under the Bonds, [Defendants] had to follow the Bonds' notice and default procedures—which it did." ECF No. [178] at 7–8. At first blush, this interpretation seems reasonable. But as the Court found in its Omnibus Order, cases like *International Fidelity Insurance Company* and *CC-Aventura* are unequivocal. The former case, the Court explained, makes clear that an obligee may not hire a replacement contractor without first allowing the surety an opportunity to exercise its rights under the performance bond. ECF No. [159] at 22 (citing 681 F. App'x at 776). The latter case, in the context of unilateral supplementation, highlighted that "failure to adhere to a performance bond notification requirement is a material breach." *Id.* at 23 (citing 2008 WL 2937856, at *2).

The Court stated in its Omnibus Order that "[t]he only scenario where Florida courts have found that an obligee could unilaterally complete a subcontract without first notifying the surety or providing the surety with an opportunity to exercise its completion options is where the bond at issue expressly provides an obligee with such authority." ECF No. [159] at 24 (citing *Dooley*, 972 So. 2d at 895). That does not mean that in *all* cases where provisions in a subcontract provide for supplementation, the Court will effectively read the notice and remedy provisions of the bond out

of existence. And the Court declines to do so here, so there has been no clear error or manifest injustice.[5]

**C. Breach of Section 5**

Defendants also argue that the Court's ruling that Defendants breached Section 5 of the Bonds is inconsistent with its holding that Plaintiff's obligations had not yet been triggered. ECF No. [171] at 13. Specifically, Defendants contend that they "could not have breached the Bonds by depriving [Plaintiff] of Section 5 election rights during a period when, by the Order's own reasoning, those rights did not yet exist." *Id*.

Defendants find the same problem in the Court's reading of § 3.1. The Court stated that once Defendants considered declaring R&S in default—demarcated as the point at which they decided they needed supplementary work—they were required to provide notice. *Id*. But § 3.1, Defendants argue, reads differently, requiring notice only where Defendants are considering declaring a default. *Id*. This formal decision-making is the key moment, not the routine "project management decision" made in correcting R&S' work. *Id.* at 13–14. And once the Court limits its consideration to the period when Defendants considered declaring R&S in default, Defendants argue there were only 6 days between Defendants issuing the Default Notice declaring R&S in default and Plaintiff filing the instant lawsuit. *Id.* at 14. The election period "had barely begun." *Id*. Plaintiff cannot claim that Defendants "deprived it of its Section 5 election rights and then refuse to exercise those rights when [Plaintiff] actually triggered the process the New Bonds create for establishing those rights." *Id*.

Plaintiff responds that Defendants are engaging in "pure re-argument." ECF No. [173] at 14. Plaintiff argues that Defendants' position is a "strange circular twist:" by Defendants' logic,

---

[5] That the Subcontracts described themselves as governing over the Bonds, ECF No. [171-2], does not change the Court's analysis, because the two are not in conflict.

they could not have deprived Plaintiff of its right to perform because they had already taken away Plaintiff's ability to perform before formally triggering Plaintiff's right to perform. *Id*.

Plaintiff points out that Defendants cite to no case affirming their conduct. Indeed, all the relevant case law, Plaintiff argues, affirms that "hiring completion contractors before triggering the surety's right is a material breach." *Id.* (citations omitted).

Finally, Plaintiff points out that the Bonds require Defendants to give Plaintiff a period of "reasonable promptness" to elect a remedy and then an additional seven days after a second written notice. *Id*. By Defendants' own account, they gave the seven-day notice in the same letter as the termination, thereby giving Plaintiff no period to perform with "reasonable promptness" and no second notice. *Id.* at 15. This is an independent breach, so it is nonsensical that Plaintiff had to wait seven days before seeking judicial relief. *Id*.

Defendants reply that the Court misapprehended Suffolk's role. ECF No. [178] at 9. Suffolk was not hired to supplement R&S's work but was instead "the overall general contractor for the entire Project and, as such, was responsible for supervising R&S's work and ensuring timely completion of the Project." *Id*. "Consistent with standard construction practice," R&S supplemented or corrected R&S' work to keep the project on track. *Id*. R&S continued performing work on the project until its termination in September 2023. *Id*.

Moreover, Defendants contend that the project's timeline undermines Plaintiff's "reasonable promptness" argument. *Id*. The undisputed facts show that Plaintiff was on notice and knew about R&S' performance issues since September 2021. *Id.* at 10. It was only when Defendants "invoked the formal default process" that Plaintiff "immediately chose litigation over election." *Id*. Thus, Plaintiff's "reasonable promptness" argument is rendered moot by the fact that it filed the instant suit just six days after the September 8, 2023 Default Notice—rather than

exercise its now-triggered election rights. *Id*. Furthermore, § 4 of the Bonds made clear that a failure to comply with § 3.1 does not release the surety unless and to the extent that the surety demonstrates actual prejudice, which Plaintiff has not done. *Id*.

Finally, Defendants argue that the Bond's "second notice requirement" favors Defendants. Plaintiff cannot claim it was denied a period of "reasonable promptness" when it did not even try to exercise a contractual option and instead filed suit—nothing in Defendants' actions prevented Plaintiff from making an election. *Id*.

The Court declines to reconsider its prior decision based on these arguments, as the arguments are a re-litigation of points that have already been addressed by the Court. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) ("A motion for reconsideration cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." (internal quotation marks omitted)). The Court explained in its Omnibus Order how Defendants breached § 5 of the Bonds, notwithstanding that Plaintiff's obligations had not yet technically been triggered. ECF No. [159] at 26. The Court explained its finding that Suffolk was functioning as a replacement contractor for R&S because "Suffolk backcharged R&S for the work and was paid with funds from the Subcontracts." ECF No. [159] at 25. Because Defendants had functionally engaged a replacement contractor—and, in the process of doing so, delayed or avoided declaring a default—they deprived Plaintiff of its right to make a meaningful election under § 5 of the Bonds. *Id*. The Court found a breach irrespective of whether Plaintiff's election rights had technically been triggered, because Defendants' actions made those rights meaningless when they "attempted to ameliorate R&S's defective work themselves." *Id.* at 26. The Court fully acknowledged that Defendants took their actions "before triggering Plaintiff's § 5 rights," but their actions still "prevented Plaintiff from potentially hiring a better or more cost-

effective contractor to remedy the work Suffolk had supplemented and repaired during the prior three years." *Id*. The breach was that Defendants' actions deprived Plaintiff of its ability to protect itself pursuant to its performance options granted under § 5 of the Bond. *Id.* (citing *PCL Constr. Servs., Inc. v. Hanover Ins. Co.*, No. 611CV131ORL18DAB, 2012 WL 13102409, at *6 (M.D. Fla. Aug. 28, 2012)).

The Court sees no reason to depart from its reasoning, as it specifically found that an "obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." ECF No. [159] at 18 (quoting *PCL Constr. Servs., Inc.*, 2012 WL 13102409, at *6 (citations omitted)). Indeed, multiple cases confirm this state of the law, and the Court cited several examples in its order, including *School Board of Escambia County, Florida v. TIG Premier Insurance Co.*, 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000), *PCL Construction Services, Inc.*, *Arch Insurance Company v. John Moriarty & Associates of Florida, Inc.*, 223 F. Supp. 3d 1275, 1277 (S.D. Fla. 2016), and *North America Specialty Insurance Company v. Ames Corporation*, No. 09-80966-CIV, 2010 WL 1027866, *2-4 (S.D. Fla. Mar. 18, 2010). ECF No. [159] at 18–19. The Court explained that, pursuant to *PCL Construction Services, Inc.*, if the obligee had unilaterally hired alternate contractors to complete the subcontract without first providing the surety with an opportunity to exercise its completion options under the bond, such unilateral action would be a material breach. *Id.* (citing 2012 WL 13102409, at *6). In other words, the Court found that even where the surety's rights have not yet been triggered, a bond can be breached and its provisions rendered null and void by an obligee's unilateral remedial actions, as such actions deprive the surety of its bargained-for rights. *Id.*

The Court similarly declines to reconsider its finding of a breach of § 3. Defendants argue that the Court improperly demarcated the point at which Defendants were considering declaring a default as "when Defendants determined they would likely need a replacement or supplemental contractor to complete Subcontracts." ECF No. [171] at 13 (quoting ECF No. [159] at 22). Instead, they argue that the relevant point that triggered their notice obligations was, under the old Bonds, when they actually considered declaring default and, under the new Bonds, when they actually declared a default and terminated R&S. *Id.* at 13–14. But the Court's conclusion depended simply on the fact that Defendants' decision to unilaterally supplement R&S' work came *before* it allowed Plaintiff an opportunity to make an election—that was the breach. ECF No. [159] at 23 (citations omitted).

Indeed, the Court found *Insurance Company of North America v. Metropolitan Dade County* instructive. As the Court explained, that case found a material breach in the obligee's failure to notify even where there was no bond provision expressly prohibiting the obligee from unilaterally hiring an alternate contractor to complete the work prior to declaring default. *Id.* at 23 (citing 705 So. 2d 33, 35 (Fla. 3rd DCA 1997)). Similarly, in *CC-Aventura*, the district court held—and the Eleventh Circuit affirmed—that the obligee had breached where it provided notice of default only after unilaterally completing the work. *Id.* at 23 (citing 2008 WL 2937856, at *2). The Court also cited *PCL Construction Services, Inc.* and several other cases, all of which combine to confirm a simple proposition, one that the Court conveyed in its initial order: a breach by an obligee is possible based solely on unilateral supplementation without notice. Thus, the Court declines to reconsider its Omnibus Order on the basis of Defendants' arguments.

**D. Suffolk as a Replacement Contractor**

Defendants argue that the Court's analysis relied on cases in which "the obligee brought in a *new* third-party after the principal left or had been terminated." ECF No. [171] at 14. Here,

Suffolk had already been the general contractor for the entire project since July 2020. *Id.* at 15. Change Order-001, Defendants argue, "simply formalized Suffolk's existing obligation to manage its own subcontractor's performance." *Id*. It did not make Suffolk a replacement contractor. *Id*.

Plaintiff responds that Defendants are asking the Court to change a factual finding with no new evidence. ECF No. [173] at 15. This, Plaintiff contends, is "a classic attempt to instruct the Court how it 'could have don't it better' the first time." *Id.* (citation omitted). Instead, Plaintiff argues, the reality is that Suffolk performed both roles. *Id*. The Continuation Agreement makes clear that R&S worked for Defendants, not Suffolk. *Id*. So when Defendants entered into the Settlement Agreement with Suffolk and agreed to pay Suffolk R&S' contract funds to perform R&S' work, Suffolk definitively became a completion contractor. *Id*.

Defendants reply that Change Order-001 "reallocated internal responsibilities between [Defendants] and Suffolk for overseeing quality and timing, which is a common project management arrangement. It did not change the contractual relationship between [Defendants] and R&S." ECF No. [178] at 10.

Reconsideration is not warranted, as the Court addressed this matter in its Omnibus Order. The Court found that Change Order-001 "was unquestionably for the purpose of remedying deficiencies in R&S's work, given that Suffolk backcharged R&S for the work and was paid with funds from the Subcontracts." ECF No. [159] at 25. Defendants present no new evidence that contradicts the Court's initial conclusion. Indeed, neither Defendants' SMF, their nonconforming statement of facts, nor their proposed conforming statement of facts contradicts the assertions by Plaintiff that Suffolk (i) backcharged R&S for the work and (ii) was paid with Subcontract funds. *See generally* ECF Nos. [124], [143], [171-1]. These facts were and remain highly probative. A motion for reconsideration cannot be used to "relitigate old matters," and that is precisely what

Defendants attempt to do here. *Michael Linet, Inc. v. Village of Wellington*, Fla., 408 F.3d 757, 763 (11th Cir. 2005). They simply rehash their argument that Suffolk was not a replacement contractor without providing new evidence or even any meaningful rebuttal to the facts that underpinned the Court's initial conclusion.

**E. Plaintiff's "Actual Knowledge"**

Defendants argue that the Court's finding that prejudice is "presumed" rested on a faulty understanding. ECF No. [171] at 16. Specifically, Defendants argue that prejudice is only presumed where the obligee fails to provide *any* notice to the surety, but here, Defendants provided notice in September 2021. *Id*. Plaintiff then "did nothing for nearly two years." *Id*. Because Plaintiff had notice from September 2021, it must demonstrate actual prejudice, but Plaintiff has not and cannot. *Id*. Indeed, Plaintiff cannot show it would have taken any different action, because it could not act before the "conditions precedent . . . have been satisfied." *Id*.

Plaintiff responds that Defendants are again purely rearguing earlier-made points. ECF No. [173] at 15. Giving Plaintiff preliminary notice is not the same as giving it "two years" to act. *Id*. This is "a blatant request for the court 'to rule twice on the same arguments by the same party upon request.'" *Id.* at 16 (citation omitted). And there is no basis to revisit the Court's earlier finding, Plaintiff argues. *Id*. The Court already decided that the Bonds require default/termination and pledge of contract funds to trigger Plaintiff's obligations, that "failure to comply with these conditions precedent is a breach with no proof of prejudice required, and that [Defendants] waited over two years before taking the mandatory steps under the Bonds thereby preventing [Plaintiff] from exercising its rights." *Id*.

Defendants, in their Reply, reiterate that Plaintiff "has never demonstrated, or even attempted to demonstrate, actual prejudice." ECF No. [178] at 10.

Again, the Court has already addressed this point, and Defendants raise nothing new that should cause the Court to rethink its earlier conclusion. *See Soto v. United States Sec'y of State*, No. 618CV2003ORL40LRH, 2019 WL 11505061, at *2 (M.D. Fla. Dec. 23, 2019) (a party "cannot obtain reconsideration by relitigating matters already addressed by the Court"). The Court explained that prejudice is presumed where there is a "lack of notice or unilateral supplementation [that] deprives the surety of its ability to exercise its completion options under the bond." ECF No. [159] at 20–21 n.13. (citing *Ames Corp.*, 2010 WL 1027866, at *8 n.7). The latter part of that sentence is critical; the lack of notice yields a presumption of bias *because it deprives the surety of an opportunity to act*. Here, Defendants' September 2021 notice, by their own admission, did not give Plaintiff the ability to act. So Defendants' continued remediation of R&S' work and depletion of Subcontract funds, done at a time when Plaintiff could do nothing to intervene, deprived Plaintiff of any ability to act. Thus, the Court declines to reconsider its Omnibus Order on the basis of Defendants' presumption-based arguments.

**F. Latent Defects**

Finally, Defendants argue that the Continuation Agreement released the Original Bonds "except for latent defects in R&S' prior work." ECF No. [171] at 16–17 (citing ECF No. [159] at 4). Those latent defects are now the subject of claims by the South Tower condominium association. Even if the Court maintains its finding of a breach, Defendants argue the Court "should not terminate bond coverage for obligations that have nothing to do with the conduct at issue." *Id.* at 17.

Plaintiff responds that Defendants "stipulated on the record that if the Court found it breached the Bonds, the Bonds would be void for all legal purposes." ECF No. [173] at 16. It was this very promise that "induced [Plaintiff] to withdraw its pending *Motion for Leave to File a Supplemental Amended Complaint* based precisely on A3's new claims of defects." *Id*. Thus, by

requesting reconsideration, Defendants are breaching their word to the Court. Moreover, Plaintiff argues there is no legal basis for Defendants to revoke their stipulation. Once surety bonds are rendered void due to breach, they are void for all future purposes." *Id*.

Defendants reply that "[i]n the absence of a citation to the record," they cannot "meaningfully evaluate or respond to" Plaintiff's assertion regarding its stipulation. ECF No. [178] at 11. Furthermore, Defendants "raised latent defects in the alternative: even if the breach finding stands, it should not terminate coverage for obligations unrelated to the conduct at issue." *Id*.

This is an entirely new argument by Defendants and therefore not one that can be raised on summary judgment. *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (a motion for reconsideration cannot be used to "raise argument or present evidence that could have been raised prior to the entry of judgment"). Indeed, nothing in Defendants' Answer, ECF No. [99], Motion for Summary Judgment, ECF No. [123], Defendants' response to Plaintiff's Motion for Summary Judgment, ECF No. [142], or Defendants' Reply in Support of their Motion for Summary Judgment, ECF No. [150], discusses this "latent defects" argument, though the argument was available to Defendants. The Court therefore declines to consider this argument now.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion to File a Conforming Statement of Facts and for Reconsideration of the Court's Omnibus Order on Cross Motions for Summary Judgment ECF No. 159, **ECF No. [171]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 20, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record